## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **RICHARD TANDY SMITH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIV-99-1329-R** |
| | ) | |
| **GARY GIBSON,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Richard Tandy Smith was convicted of first degree murder in the District Court of Canadian County, State of Oklahoma and sentenced to death, the jury having found the existence of two aggravating circumstances: 1) that Mr. Smith had twice been convicted of felonies involving the use or threat of violence to a person; and 2) that there existed the probability that he would commit criminal acts of violence which would constitute a continuing threat to society. Petitioner appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals. That court affirmed the conviction and sentence. *Smith v. State*, 819 P.2d 270 (Okla. Crim. App. 1991). Certiorari was denied by the United States Supreme Court in *Smith v. Oklahoma*, 504 U.S. 959, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992). Mr. Smith subsequently sought post-conviction relief, which was denied by the trial and appellate courts. Mr. Smith filed a petition for a writ of habeas corpus with this court on June 29, 2000. In that petition, Mr. Smith presents the following eleven grounds for relief:

1.      Trial counsel was ineffective in preparing and presenting a second stage defense;

2.      Petitioner received ineffective assistance of counsel on direct appeal;

3.      Petitioner was denied a fair trial because he was not provided a psychiatric expert to assist in his defense;

4.      The State employed an unconstitutional burden of proof at the competency hearing, warranting habeas relief;

5.      The Oklahoma Court of Criminal Appeals was biased;

6.      There was insufficient evidence to support Petitioner's conviction and the trial court erred by not giving the accomplice corroboration instruction;

7.      Petitioner was denied a fair trial due to the trial judge's failure to instruct the jury on the informant's credibility;

8.      Petitioner was denied a fair trial as a result of the State's failure to disclose material exculpatory evidence;

9.      The "continuing threat" aggravating circumstance is unconstitutional;

10.      Petitioner's punishment phase was tainted by confusing and unconstitutional weighing instructions;

and

11.      The cumulative effect of the errors warrants the granting of habeas relief.

In connection with his first, second and third grounds for relief, Petitioner requested an evidentiary hearing to develop the factual record.  He requested oral argument on any and

2

all grounds.  Petitioner also requested the appointment of two experts: 1) a psychiatrist to provide expertise and assistance concerning Petitioner's psychiatric condition; and 2) a lawyer experienced in capital litigation to provide testimony regarding his ineffective assistance of counsel claims.  Petitioner presented each of these grounds for relief to the highest appellate court in Oklahoma having criminal jurisdiction, the Oklahoma Court of Criminal Appeals, either on direct appeal or during post-conviction proceedings.

On February 20, 2001, Petitioner was granted leave to take the deposition of his trial counsel, Mark Lea ("Beau") Cantrell, and to expand the record by filing a transcript of that deposition.  Additionally, both parties were granted leave to file and did file supplemental briefs addressing the issues of ineffective assistance of trial and appellate counsel in light of Mr. Cantrell's testimony.  Thereafter, the Court set an evidentiary hearing on Petitioner's claim for ineffective assistance of trial counsel in preparing and presenting a second stage defense for July 16, 2001.  That hearing was reset on August 15, 2001, October 15, 2001 and November 7, 2001, being continued to each of those dates on motion of one or both parties.  Before the last date set for the evidentiary hearing, Respondent moved to strike it.  Following briefing on the motion to strike, the Court, upon Petitioner's motion, authorized payment of an expert witness for Petitioner, Jonathan J. Lipman, Ph.D., a neuropsychologist, and directed the parties to file offers of proof to assist the Court in determining whether an evidentiary hearing was necessary on the issues of alleged ineffective assistance of trial and appellate counsel.  Thereafter, before the end of 2001, the parties filed their offers of proof.  Petitioner then sought appointment of another expert to testify on his behalf at the evidentiary hearing,

Patricia Fleming, Ph.D., a psychologist, whose report had been filed in state post-conviction proceedings. Thereafter, the parties agreed to file a stipulation of testimony in lieu of an evidentiary hearing and the Court authorized the payment of both Dr. Lipman and Dr. Fleming for preparation time and giving deposition testimony. On June 26, 2002, Petitioner took the deposition of Patricia Fleming, Ph.D. and on July 29, 2002, Petitioner took the deposition of Jonathan J. Lipman, Ph.D. Thereafter, by Order entered October 28, 2002, the Court granted Petitioner's motion to supplement the record by granting Petitioner leave to file the transcripts of the depositions of Dr. Jonathan Lipman and Dr. Patricia Fleming. On December 16, 2002, the Court also granted Respondent's motion to expand the record with written questions propounded to Dr. Fleming and her answers. *See* Exhibits "1" and "2" to Doc. No. 87.

Meanwhile, on October 24, 2002, Petitioner filed a motion to hold this case in abeyance to permit him to present an Eighth Amendment claim predicated on an intervening change in the law articulated in *Atkins v. Virginia*, 533 U.S. 976, 122 S.Ct. 24, 150 L.Ed.2d 805 (2002) to the Oklahoma state courts. On January 21, 2003, over the objection of the Respondent, the Court stayed this case so that Petitioner could exhaust that claim. On September 7, 2004, Respondent filed a notice with this Court [Doc. No. 97] advising that by an Order entered March 24, 2004, the Oklahoma Court of Criminal Appeals granted Petitioner's request to dismiss his *Atkins* claim and denied relief on a second claim for post-conviction relief asserted by Petitioner, on the ground that the jury was not instructed that it must find that the aggravating circumstances outweighed the mitigating circumstances

4

beyond a reasonable doubt, allegedly as required by *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).   Thereafter, Petitioner was granted leave to file any final motions and supplemental briefs in this case and several extensions of time to do this. Despite this, Petitioner never filed any motion for leave to amend his petition for a writ of habeas corpus to assert either or both of the claims asserted in his second application for post-conviction relief in state court.   Thus, on February 25, 2005, the Court set this case for an evidentiary hearing on April 25, 2005 and granted both parties leave to file any supplemental authority before the evidentiary hearing.   *See* Doc. No. 110.   Petitioner filed supplemental authority on March 10, 2005 and Respondent responded to Petitioner's supplemental authority on March 21, 2005.

On April 25, 2005, the Court held an evidentiary hearing on the issue of ineffective assistance of trial counsel at the second stage and heard oral arguments.   At the hearing, Petitioner presented the testimony of David Autry, a criminal defense lawyer, and offered without objection the deposition testimony of Mark Lea "Beau" Cantrell, Dr. Jonathan Lipman and Dr. Patricia Fleming, the Reports comprising the Appendix to Petitioner's Brief in Support of Appeal from Denial of Post-Conviction Relief filed with the Oklahoma Court of Criminal Appeals and the Appendix to his request for an evidentiary hearing on his application for post-conviction relief filed in the state district court.   Respondent did not present any evidence but did cross-examine Mr. Autry.   Both parties presented oral argument.

The Court now proceeds to address the claims made herein.

## I.

Respondent asserts that Petitioner's claim for ineffective assistance of trial counsel in the penalty stage is procedurally barred because it was not raised on direct appeal and the Oklahoma Court of Criminal Appeals ("OCCA") in post-conviction proceedings found that the claim was procedurally defaulted.  Respondent acknowledges, however, that the OCCA did review this claim on the merits but observes that that court did so only in the context of the Petitioner's claim for ineffective assistance of appellate counsel.  Thus, Respondent asserts that habeas review of this claim is barred unless Petitioner can show cause for his procedural default in state court and actual prejudice resulting from the alleged violation of federal law or that failure to consider the claim will result in a fundamental miscarriage of justice.  Noting, however, that the Tenth Circuit in *Brecheen v. Reynolds*, 41 F.3d 1343, 1363-64 (10th Cir. 1994), *cert. denied*, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995) and *English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998) questioned the adequacy of Oklahoma's procedural default rule with respect to ineffective assistance of counsel claims, and that Petitioner has asserted a claim for ineffective assistance of appellate counsel based upon his failure to assert a claim for ineffective assistance of trial counsel, Respondent has also addressed this claim on the merits.

Addressing the merits of the claim, Respondent asserts that it is obvious from the entire record, including trial counsel's questioning and testimony elicited during the pretrial competency hearings and during the penalty phase, that Petitioner's trial counsel conducted a reasonable investigation for mitigation evidence.  Respondent asserts, however, that "more

detailed evidence" of Petitioner's mental illness, such as that presented during post-conviction proceedings, would have been a two-edged sword. Indeed, Respondent asserts that evidence of Petitioner's mental state at the time of the crime and of his mental health history would have been viewed by the jury as corroborative of the continuing threat aggravator and not as mitigating evidence. Accordingly, Respondent infers that "trial counsel's failure to present anything more than a cursory reference . . . Petitioner's psychiatric history, *may* have been a conscious strategic choice." Response to Petition for Writ of Habeas Corpus at p. 21 (emphasis added). Testimony from Petitioner's family members regarding Petitioner's turbulent childhood would also have been viewed by jurors as corroborative of the overwhelming evidence introduced by the prosecutor in support of the continuing threat aggravator, Respondent maintains. In summary, Respondent asserts that Petitioner can hardly claim that trial counsel rendered deficient performance because he failed to present these types of evidence or that Petitioner suffered prejudice as a result of that failure because it is just as likely that presenting Petitioner's alleged inability to conform his behavior to society's rules due to inability to control his mental illness and/or substance abuse would cause the jury to react negatively to Petitioner's cause.

Even assuming, however, that trial counsel's performance in the penalty phase was deficient, Respondent asserts that Petitioner has not shown even a reasonable probability that had this evidence been presented the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death and cannot show this in light of the overwhelming evidence in support of guilt and the two aggravators alleged by the

State.  Respondent maintains that relief on this claim can be denied solely on the record and that an evidentiary hearing is not warranted.

Petitioner in response to Respondent's argument that this claim is procedurally barred relies on Judge Wayne Alley's Memorandum Opinion and Order in *Cargle v. Gibson*, No. CIV-97-1870-A and the Tenth Circuit's opinion in *Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001) to argue that the claim is not procedurally barred.  The *Battenfield* case is of no assistance to Petitioner, however, because while the Oklahoma Court of Criminal Appeals had held that Mr. Battenfield's ineffectiveness claim was waived or barred, it disposed of the claim on its merits. 236 F.3d at 1227 n. 4.  Judge Alley's opinion in *Cargle v. Gibson* is likewise of no help to Petitioner.  The Tenth Circuit in *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) held that Judge Alley had improperly invoked the exception to the state procedural bar recognized in *Walker v. Attorney General for the State of Oklahoma*, 167 F.3d 1339 (10th Cir.), *cert. denied*, 528 U.S. 987, 120 S.Ct. 449, 145 L.Ed.2d 366 (1999) to reach the merits of the petitioner's ineffective assistance of counsel claim.  317 F.3d at 1201 & n.3.  It held that the *Walker* exception did not apply to the petitioner's ineffective assistance of counsel claim, which would have been procedurally barred even under Oklahoma's Post-Conviction Procedure Act as it existed prior to its revision in 1995.  *See id*.  Rather, the Tenth Circuit employed traditional federal standards for determining whether the state procedural bar should be excused.  *See id*. at 1201-02 & 1212.  In this case, Petitioner's claim for ineffective assistance of trial counsel would be waived or defaulted under either version of Oklahoma's

8

post-conviction statutes inasmuch as Petitioner's claim and his failure to raise it earlier is not based upon or due to an intervening change in the law.

Nevertheless, because Petitioner's claim for ineffective assistance of trial counsel during the penalty phase of his trial requires consideration of matters outside the trial record, Oklahoma's procedural bar rule is inadequate to bar federal review. *See Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003); *Revilla v. Gibson*, 283 F.3d 1203, 1220 (10th Cir.), *cert. denied*, 537 U.S. 1021, 123 S.Ct. 541, 154 L.Ed.2d 430 (2002); *Sallahdin v. Gibson*, 275 F.3d 1211, 1234 (10th Cir.); *Romano v. Gibson*, 239 F.3d 1156, 1179 (10th Cir.), *cert. denied*, 534 U.S. 1046, 122 S.Ct. 628, 151 L.Ed.2d 548 (2001).

Accordingly, the Court proceeds to examine the merits of Petitioner's claim that his trial counsel rendered ineffective assistance because he failed to investigate, prepare and present a viable second stage defense. *See* Petition at p. 24. Specifically, Petitioner asserts that his trial counsel did not investigate Petitioner's turbulent childhood and family history, his history of drug abuse and his psychiatric history and present a "defense" predicated thereon at the penalty stage.

Petitioner did not fail to develop the factual basis for his claim of ineffective assistance of trial counsel in state court proceedings. *See* 28 U.S.C. § 2254(e). He diligently sought to develop the factual basis underlying his claim but the state court prevented him from doing so. Petitioner presented affidavits and expert reports to the state district court and the OCCA in post-conviction proceedings. He sought an evidentiary hearing in connection with his application for post-conviction relief and again on appeal from denial of that relief.

9

His requests for an evidentiary hearing were denied by both the district court and the OCCA. Accordingly, 28 U.S.C. § 2254(e)(2) does not apply and, because Petitioner's allegations and evidence, which were not contravened by the existing factual record when the petition herein was filed, would, if true, entitle Petitioner to relief, the Court, as previously mentioned, granted Petitioner's request for an evidentiary hearing on that claim. *See Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 1487-88, 146 L.Ed.2d 435 (2000). *See also Mayes v. Gibson*, 210 F.3d 1284, 1287-88 n. 2 (10th Cir.), *cert. denied*, 531 U.S. 1020, 121 S.Ct. 586, 148 L.Ed.2d 501 (2000); *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998).

To establish that his trial counsel's assistance was constitutionally ineffective, Petitioner must demonstrate that 1) his counsel's performance was deficient, that is, it fell below a standard of objective reasonableness, and 2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-89, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674, 693-94, 698 (1984). Where trial counsel's alleged failure to investigate and/or present evidence pertains to the capital sentencing stage of trial, as here, the prejudice inquiry is whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating factors did not warrant death" *Battenfield v. Gibson*, 236 F.3d at 1226, quoting *Strickland v. Washington*, 466 U.S. at 695, 104 S.Ct. 2052, 80 L.Ed.2d at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d at 698. In assessing prejudice at the capital sentencing stage, a court must consider the mitigating

evidence counsel failed to present relative to what was presented, the aggravating factors found by the jury and the overall strength of the State's case. *Cargle v. Mullin*, 317 F.3d at 1221; *Clayton v. Gibson*, 199 F.3d 1162, 1178-79 (10th Cir. 1999), *cert. denied*, 531 U.S. 838, 121 S.Ct. 100, 148 L.Ed.2d 59 (2000). There is a strong presumption that counsel's conduct was constitutionally reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment" and sound trial strategy rather than as a result of negligence or neglect. *See Sallahdin v. Mullin*, 380 F.3d 1242, 1247-48 (10th Cir. 2004), petition for cert. filed (Mar. 17, 2005) (No. 04-9284), *quoting Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d at 695. Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 695. Strategic decisions made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitation on investigation. *Id*. To overcome the strong presumption of professional reasonableness, Petitioner has the burden of proving by a preponderance of the evidence that his trial counsel acted unreasonably in failing to investigate and/or present mitigating evidence. *Sallahdin v. Mullin*, 380 F.3d at 1248.

"Counsel has a duty to make reasonable investigation for mitigating evidence or to make a reasonable decision that particular investigation is unnecessary. *Walker v. Gibson*, 228 F.3d 1217, 1233 (10th Cir. 2000) (citing *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d at 695), *cert. denied*, 533 U.S. 933, 121 S.Ct. 2560, 150 L.Ed.2d 725 (2001)). The reasonableness of an attorney's investigation is dependent on the circumstances of the case.

*Id*.  When reviewing an attorney performance at the sentencing stage of a capital case, there is a need to apply even closer scrutiny.  *Battenfield v. Gibson*, 236 F.3d at 1226, *citing Cooks v. Ward*, 165 F.3d 1283, 1294 (10th Cir. 1998), *cert. denied*, 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999).  This is so because "[m]itigating evidence plays an overwhelmingly important role in the 'just imposition of the death penalty,'" *Romano v. Gibson*, 239 F.3d at 1180, *quoting Mayes v. Gibson*, 210 F.3d at 1288, and "[t]he sentencing stage is the most critical phase of a death penalty case." *Id.*  "Any competent counsel knows the importance of thoroughly investigating and presenting mitigation evidence." *Id*.  Mitigation evidence affords the opportunity to humanize the defendant, explain why the defendant did what he did and counter the horror of the crime; absent such evidence, the defendant probably has little to no chance of avoiding the death penalty, as a practical matter.  *See id*.  On the other hand, the failure to present available mitigating evidence is not *per se* ineffective assistance of counsel.  *Boyd v. Ward*, 179 F.3d 904, 918 (10th Cir. 1999), *cert. denied*, 528 U.S. 1167, 120 S.Ct. 1188, 145 L.Ed.2d 1093 (2000); *Brecheen v. Reynolds*, 41 F.3d at 1368, *citing Bolender v. Singletary*, 16 F.3d 1547, 1577 (11th Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994).  However, an attorney's choice not to present mitigating evidence "after having investigated a defendant's background . . .  must have been *reasonable* under the circumstances."  *Brecheen*, 41 F.3d at 1369, quoting *Bolender v. Singletary*, 16 F.3d at 1558 (*quoting Stevens v. Zant*, 968 F.2d 1078, 1083 (11th Cir. 1992), *cert. denied*, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993)).

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d at 695. This is so because counsel's actions and inactions are usually based on information supplied by the defendant and on informed strategic choices made by the defendant. *Id*. What investigation decisions by trial counsel are reasonable depends critically on this information. *Id*. Thus, inquiry into trial counsel's conversations with the defendant may be critical in assessing the reasonableness of counsel's investigation decisions and decisions as what defenses and mitigating evidence are presented. *See id*. Likewise, the Court thinks, inquiry into trial counsel's conversations with family members is important in assessing what mitigation evidence was available to trial counsel.

It is against this legal landscape that the Court assesses the merits of Petitioner's claim that his trial counsel's assistance at the capital sentencing stage of his trial was constitutionally ineffective because he failed to investigate and present mitigating evidence.

The evidence proffered by Petitioner's counsel in the sentencing stage of trial, as mitigating evidence, is shocking in its brevity, its failure to humanize the Petitioner or to explain his actions. Basically, the evidence consisted of Petitioner's mother's testimony that the Petitioner had been under the treatment of "psychiatrist physicians" in Sacramento, California nine or ten years before the trial, that she didn't remember any of the findings or diagnoses of the physician and that she was testifying for the purpose of requesting that the punishment inflicted be life imprisonment, and the testimony of Petitioner's older sister that Petitioner had lived with her, after their parents divorced, on and off since she was 15, when

13

she had married and that she requested that the jury "please give [her] brother a chance." Tr. Vol. XI at pp. 209-212.  The transcript of the second stage also indicates that Petitioner himself initially wanted to testify about the events resulting in his prior convictions but that after a colloquy with the trial judge in which the judge advised him he could not invoke the Fifth Amendment and further colloquy and consultation with trial counsel, Petitioner chose not to take the stand.  Tr. Vol. XI at pp. 212-215.

In connection with his assertion in his appeal from denial of post-conviction relief that trial counsel was ineffective at the sentencing stage, Petitioner presented the reports of a psychological evaluation of Petitioner performed by Pat Fleming, Ph.D., on November 12 and 13, 1992 and of a neuropharmacologist, Jonathan J. Lipman, Ph.D., based upon his interview, testing and physical examination of Petitioner performed on November 23 and 25, 1992.  *See* Appendix to Brief of Petitioner on Denial of Application for Post-Conviction Relief.  At the evidentiary hearing, Petitioner offered the depositions of these individuals, to which are attached as exhibits their reports which were included with Petitioner's post-conviction appeal brief.  Drs. Fleming and Lipman confirmed in their depositions their findings, opinions and diagnoses contained in their reports, which are summarized as follows.

Petitioner's father was in prison until Petitioner was eight years old.  Petitioner was raised by his mother, her boyfriends, his step-father and his parents' siblings.  Petitioner's mother was a drug user and dealer.  Petitioner recalled smoking his mother's marijuana when he was eight years of age.  Petitioner remembered frequent parties in which his mother was involved in fighting and violence and in which Petitioner would be involved, often getting

14

hurt by virtue of living with his mother and her friends.  Petitioner's father taught Petitioner to shop lift, steal cars and burglarize.  Petitioner and his father had frequent physical confrontations.  His father's practice, when drunk, of "sparring" with him when he was 12 and 13 years of age led to his being rendered unconscious on numerous occasions.  His father also urged him to get involved in numerous "sparring" incidents with older and larger children.  Petitioner's relationship with his father was that of friends rather than father/son and when Petitioner was older, the two would often share drugs, alcohol and women.

When Richard was approximately nine, he lived with his mother and her boyfriend in Hawaii and he experienced rejection and ridicule as a white boy among native Hawaiians. He was beaten and ridiculed as a "howlie" every day at school so his mother permitted him to stay home and drink vodka all day and play in the surf with her boyfriend.  Later, Petitioner's mother married Art Stone and quit drugs and became religious.  Mr. Stone was violent and abusive, albeit religious.  He frequently tied Petitioner to his bed, locked him in the closet and beat him.  Petitioner and his cousin began engaging in shoplifting, theft and vandalism.  He was eventually apprehended by authorities at age 11 or 12, having run away from home and stolen a car.  He was sent to juvenile hall where he attempted suicide rather than be sent home.  When he was returned to his home by the authorities, his stepfather beat him until his back and buttocks were bleeding and handcuffed him to a cot, locked in a closet, for two weeks at bedtime.

At age twelve, Richard went to live with his father.  During that time he drank his father's liquor to the point of intoxication on a regular basis and rediscovered "huffing"

volatile solvents such as lighter fluid.  He witnessed his father intravenously injecting amphetamines.

In subsequent months and years the Petitioner was shuttled between the custody of his mother, his father and his aunts and uncles.  He lived in Hawaii, Oklahoma, Nevada, Oregon and California while he was growing up.  Richard reportedly attended nine different elementary schools and four different secondary schools.  He described his attendance as terrible.  He was in special education track in elementary school but not in junior high school. He reportedly received all grades of D, F or U in the Oklahoma Public Schools in 1976 and Cs, Ds and Fs in Henderson High School in Henderson, Nevada from October, 1976 through February of 1976.  He quit school at age 14 or 15.  His biological mother did not emphasize school attendance and allowed him to stay out of school.  Petitioner's biological father encouraged fighting at school which exacerbated his problem of making friends at school, which was difficult due to his frequent moves.  Dr. Fleming administered the Wechler Adult Intelligence Scale - Revised to Petitioner.  Petitioner full scale IQ on that test was 72, placing him in the borderline intelligence range and in the 2nd percentile when compared to others of his age in the general population.

Medical records apparently obtained by Dr. Fleming reveal that two sisters and one brother of Petitioner have been diagnosed as schizophrenic.  Dr. Fleming concluded, based upon her interview and psychometric evaluation, that Petitioner suffers from chronic schizophrenia of the delusional type of such severity to significantly impair his daily functioning and, when in the acute phase, to render him psychotic.  She concluded that the

Petitioner had his first psychotic episode at age eight or nine.  Dr. Lipman reported that Petitioner began experiencing hallucinations and delusions at that time and was psychiatrically treated.  However, according to Dr. Fleming, because Petitioner did not receive adequate treatment during his youth and early adulthood and the course of Petitioner's disease was further impacted by drug and alcohol use and probable brain damage, the Petitioner continued to experience marked impairment in functioning in school, disorganization and continued episodic delusions.  Dr. Lipman reports that Petitioner experienced visual and auditory hallucinations as a child, experienced these for years before the crime and continued to experience them in prison after the crime.  One auditory hallucination in the form of the voice of an entity Petitioner calls "Larry," whom Petitioner is compelled to obey, was described by both Drs. Lipman and Fleming.  Dr. Fleming opined that Petitioner was psychotic at the time of the crime with diminished mental capacity and substantially impaired in his ability to appreciate the criminality of his conduct or to conform it to the requirements of the law at that time.  She further opined that Petitioner's impairments would have made him unable to assist his lawyer in the preparation of his defense.  Dr. Fleming acknowledged in her deposition that she had not read the transcript of the guilt stage of Petitioner's trial.

Dr. Lipman concluded, based upon Petitioner's performance on tests administered by Dr. Fleming, Petitioner's history of head trauma and injuries, as reported by Petitioner, Petitioner's reported use of LSD, and Dr. Lipman's physical examination of Petitioner's head, that Petitioner suffers permanent brain damage.

17

Dr. Lipman also completed a drug and alcohol evaluation.  As mentioned previously, Petitioner began using marijuana at eight years of age.  He later began "huffing" airplane glue and gasoline.  At age twelve, he began drinking alcohol to the point of intoxication and was also "huffing" at that time, particularly lighter fluid.  In junior high school, Petitioner began using Quaalude, Valium, a barbiturate drug known as "reds" on the street, and cigarettes soaked in PCP or phencyclidine, a drug once used as an animal tranquilizer.  He was also introduced to LSD at that time.  Petitioner described his typical drug use by his 12th and 13th year to Dr. Lipman as smoking marijuana daily, using LSD twice a week, drinking alcohol to the point of deep intoxication four days per weeks and occasionally using quaaludes and reds.   At the age of thirteen, Petitioner was introduced to intravenous methamphetamine and cocaine use.  Petitioner reported mixing them, injecting them together. He reported that his typical drug use during his fourteenth year consisted of four injections of methamphetamine per day, smoking marijuana throughout the day, injections of cocaine mixed with methamphetamine twice per week and drinking Wild Turkey whiskey at will. At fourteen, Petitioner returned to live with his father in Henderson, Nevada, where he had no ready supply of amphetamines.  He drank a lot of alcohol to assuage his withdrawal symptoms and began abusing placidyl, a tranquilizing, hypnotic drug, taking Quaaludes again, and smoking marijuana throughout the day.  Petitioner reported that he and his friends at high school in Henderson, Nevada also took LSD and smoked cigarettes soaked in PCP. At age 14 or 15, Petitioner and a friend moved into an apartment in Oklahoma City.  He began freely injecting methamphetamine again and selling methamphetamine to support his

18

habit.  At age 17, he was introduced to heroin and Dilaudid which he reported he would inject together with either methamphetamine or cocaine.  When Petitioner and his friend were caught committing burglaries and jailed, Petitioner underwent speedball withdrawal. When he was released on bond, he began ingesting hallucinogenic mushrooms which he boiled with Kool-aid and drank every day for about two months.  He then gained access to and began injecting heroin in Crescent City.  In his eighteenth year, Petitioner went to work with his father traveling around Oklahoma doing remodeling jobs.  At this point, Petitioner and his father resumed injecting methamphetamine together, even sharing needles.  Petitioner quit working with his father in 1980 and returned to Oklahoma City where Petitioner continued injecting methamphetamine and was both smoking and injecting cocaine.  By 1982, he was selling both methamphetamine and cocaine to maintain his supply and injecting large quantities of both daily, alternating with a mixture of dilaudid, heroin and morphine, most probably, according to Dr. Lipman, to mitigate the adverse consequences of psychostimulant toxicity.  He also continued his use of LSD, which at times was excessive in quantity and frequency to the point of dangerousness.  Toward the middle of 1982, Petitioner began, for the first time, to inject LSD intravenously.  After Petitioner's release from prison in July of 1983, he continued his use of methamphetamine, cocaine and heroin, staying "up for days." Petitioner was again imprisoned from January, 1985 until April, 1986, where he was treated with antipsychotic medications.  Following his release, he discontinued taking the antipsychotic medication and, beginning at the end of April until July 21, 1986, the date of the murder which is the subject of this case, he engaged in a continuous

speedballing binge, using methamphetamine and cocaine alternatively with dilaudid and a stolen pharmaceutical morphine sulphate.   Petitioner reported that he could not recall sleeping once during this three-month period.  Dr. Lipman rendered his opinion that at the time of the crime Petitioner was suffering a paranoid delusional psychotic state due to an interaction between his schizophrenia and organic brain damage due in part to a history of head injury and in part to chronic high dose methamphetamine and cocaine use, exacerbated on the day of the crime by LSD.  He, like Dr. Fleming, opined that in that state, Petitioner was unable to conform his behavior to the requirements of the law, to perceive the wrongfulness of his action and to exert meaningful control over his wrongful behavior.  He also concluded that at the time of trial, Petitioner was suffering uncontrolled schizophrenia and was being treated with a combination of drugs which would have exacerbated his condition and caused further deterioration of his mental illness.  Dr. Lipman stated that Petitioner was both paranoid and delusional throughout the trial.  Dr. Lipman admitted in his deposition testimony that he had not read the transcript of the guilt stage of Petitioner's trial.

The foregoing suggests, as Petitioner posits, that there was a wealth of mitigation evidence which should have been discovered by Petitioner's trial counsel and at least could have been utilized by him at the capital sentencing stage of Petitioner's trial.  Respondent argues, however, relying heavily upon the deposition testimony of Petitioner's trial counsel, Mark Lea ("Beau") Cantrell, taken by and offered at the evidentiary hearing by Petitioner without objection, that Petitioner's trial counsel's performance was not deficient because trial counsel "undertook substantial efforts to find mitigating evidence, enlisting the aid of two

investigators, interviewing family members, following leads regarding Petitioner's previous psychiatric treatment, and conducting extensive interviews with Petitioner himself." Supplemental Brief After Deposition [Doc. No. 42] at p. 2.  Basically, Respondent's position is that Petitioner's trial counsel investigation directed to the discovery of mitigating evidence was objectively reasonable; that Petitioner's counsel's failure to discover much of the evidence which might have been employed for mitigation purposes was due to Petitioner's and Petitioner's family members' failure to disclose the information to Petitioner's trial counsel; that some of this evidence was not available notwithstanding reasonable efforts by Petitioner's trial counsel to discover it; and that Petitioner's trial counsel made a strategic decision not to present certain evidence concerning Petitioner's upbringing, notwithstanding his discovery of this evidence, because of the risk that this evidence could be harmful to Petitioner, particularly given the fact that one of the aggravating circumstances charged was the probability that he would commit criminal acts of violence which would constitute a continuing threat to society.  Thus, in light of Respondent's arguments and in recognition of the facts that the reasonableness of counsel's actions may be substantially influenced or determined by the statements and actions of the Petitioner and Petitioner's family members and that inquiry into counsel's conversations with Petitioner and Petitioner's family members may be critical in properly assessing counsel's investigative efforts and decision, as previously observed, the Court examines the relevant testimony of Petitioner's trial counsel.

Petitioner's trial counsel, Mark Lea ("Beau") Cantrell attended the University of Oklahoma College of Law from 1973 to 1976.  He was admitted to the bar in April of 1977

after which he worked briefly at the Attorney General's Office.  He then worked as an associate for another lawyer until April of 1978, at which time he opened his own office and has been a solo practitioner since that time.  He describes his practice as a "general country practice of law," with 20 to 25 percent of his practice devoted to criminal defense work and 20 to 25 percent of his practice devoted to public finance.  For a period of about 14 years, Mr. Cantrell was a part-time assistant public defender.  Prior to representing Petitioner in this case, Mr. Cantrell had been counsel in two capital cases.  Deposition of Mark Lea Cantrell at p. 19.  Prior to representing Petitioner in this case, Mr. Cantrell had represented him in another case in Canadian County.  *Id*. at 16-17.  Cantrell was court-appointed in both of Petitioner's cases.  *Id*. at 16 & 18.

Mr. Cantrell testified that he filed motions for the appointment of a private investigator to assist in Petitioner's capital case and for appointment of an "outside psychiatrist" to examine Petitioner but the court denied both of those motions.  However, Cantrell personally paid for two sets of private investigators, one of whom had his own practice as a private investigator and another who held a masters degree in psychology and counseling but had his own investigative service and one employee who also worked on Petitioner's case.  *Id*. at 22-24.  Mr. Cantrell's memory was that the former, Mr. Weldon, served as a "facts investigator, whom Cantrell utilized to ascertain whether information the Petitioner had provided was true, to locate people and information about people and certain documents.  *Id*. at 24-25.  The other investigator, Mr. Harrell, worked directly with Cantrell and Petitioner and was to be present with Cantrell when he interviewed Petitioner,

Petitioner's family members and witnesses.  *Id*. at 25-26.  Mr. Harrell's employee was to look up forensic rules and tests and Cantrell specifically recalled that the employee researched the Luminol test used in this case, the scientific background of it, how it was administered, etc.  *Id*. at 26.

Mr. Cantrell testified that he conducted 50 to 100 interviews with Petitioner, generally in the jail and sometimes in the courthouse.  *Id*. at 34.  He conducted somewhere between 3 and 10 interviews with Petitioner's mother, brother and two sisters in the week to ten days immediately preceding trial to investigate and develop mitigating evidence.  *Id*. at 34, 53-54 & 57-58.  Cantrell discussed the case and possible mitigation with Petitioner and his family members, with the investigators and most probably consulted with other lawyers as well.  *Id*. at 54.  Mr. Cantrell recognized that defendants are often reticent to reveal things in their background such as physical abuse, *see id*. at 64, even when it is for their own good or its going to help them, *id*. at 70, so he repeatedly stressed the seriousness of the charges, telling Petitioner "I've got to know everything that you can tell me about this case and about you for the purpose of your defense."  *Id*.

With respect to evidence concerning Petitioner's mental health, Mr. Cantrell related that Petitioner told him during his interviews with him that he had been treated for some variety of mental illness at a facility as a juvenile and that he had been treated at other facilities.  *See id*. at 34-35 & 48.  However, when Cantrell or the investigators called the places to which Petitioner referred, "they would have no record of him having been there or having been treated" there.  *Id*. at 35.  *See id* at 48.  Finally, based on information Petitioner's

family provided, Cantrell's investigators were able to locate the facility in California where Petitioner had been treated as a juvenile. *Id*. However, the only records that the facility had, which were sent to Cantrell, were of his admittance and discharge. *Id*. Mr. Cantrell did attempt to utilize those records during the penalty stage of trial but the court would not allow them to be introduced because they were not authenticated. Mr. Cantrell did elicit testimony from Petitioner's mother that he had been under psychiatric care in Sacramento, California, nine or ten years prior to trial. Cantrell acknowledged that during the early part of the pretrial process Cantrell had doubts about the Petitioner's competence to stand trial. *Id*. at 41. For that reason, and because the court-appointed expert who evaluated Petitioner's competence to stand trial was a psychologist rather than a psychiatrist who did not conduct any "screening" tests for mental illness, Mr. Cantrell requested that the Court appoint an independent psychiatrist to examine Petitioner but the court denied that request. *See id*. at 41-47. Mr. Cantrell stated that he wanted the expert to tell him if Petitioner was competent to stand trial and if he was competent at the time the acts were alleged to have occurred but that certainly, if the expert had opined that the Petitioner was mentally ill, he would have used the expert in the sentencing stage as well. *Id*. at 47. Mr. Cantrell further testified that if he had had the information contained in the reports of Drs. Fleming and Lipman, at the time of trial, that information would have been helpful to him in formulating a second stage defense, *id*. at 38, and indeed, had Petitioner had the information before the trial started, "it would have led to a complete[ly] different theory of defense." *Id*. at 39. In this regard, Mr. Cantrell testified that Petitioner had always maintained his innocence and that someone else

24

had done the shooting and so the theory of defense for the guilt stage was to develop reasonable doubt as to the State's proof, *see id*. at 39-40, 41, and Mr. Cantrell believed that there was a better than 50 percent chance of acquittal. *Id*. at 96. Thus, the strategy was not to "give up" on the guilt stage and spend all of their time preparing for the mitigation or sentencing stage. *Id*. at 46. However, Mr. Cantrell testified that if a court-appointed psychiatrist had determined that Petitioner was either incompetent to stand trial or incompetent at the time the crime occurred, then naturally one would use that in the sentencing phase and that it was certainly possible to maintain that someone was insane at the time of the crime but that if the jury rejected that defense to use insanity or mental illness in mitigation. *Id*. at 46. Cantrell later testified that if he had had the information contained in the reports of Drs. Fleming and Lipman, he would have used, it but "[n]one of the information, for any practical purpose, was known or available to [him] at the time of trial" and he "had no inkling of it." *Id*. at 97. He testified that "the only place he could get information was from Mr. Smith and his relatives and Smith's rap sheet. *Id*. at 98. With regard to Petitioner's mental status in general, Cantrell testified that he knew the Petitioner had been prescribed "mild-altering drugs" while in jail, that he had attempted to commit suicide, which Cantrell did not consider the act of a sane person, *id*. at 48-49, and that Petitioner had difficulty proceeding in a linear fashion, i.e., relating what occurred in a sequential fashion. *Id*. at 40-41, 78 & 79. Mr. Cantrell also testified that he could not remember having any information about injuries to Petitioner's head. *Id*. at 47. However, other than the difficulty relating events in a linear fashion, Cantrell observed nothing else

about Petitioner that would lead him to believe that Petitioner was either unable to understand the nature of the charges against him or that he was unable to consult effectively with Cantrell and rationally assist Cantrell in his defense. *Id.* at 77-78. Cantrell further testified that Petitioner understood the seriousness of the proceedings, especially considering his two prior convictions for violent felonies, *id*. at 85-86 & 98, and that Petitioner understood that he faced the death penalty if he was found guilty of first degree murder. *Id*. at 84. Mr. Cantrell further testified that Petitioner never said that he was hallucinating at the time of the murder or that a voice named Larry commanded him to commit the murder nor did he mention any other hallucinations to him. *Id*. at 89. Cantrell did testify that Petitioner told him "he had periods that he couldn't remember things." *Id*. Cantrell described Petitioner as "the best defendant I've ever represented" as far as following Cantrell's instructions and communicating and conferring with Cantrell during the course of trial proceedings. *See id*. at 82-83. During pretrial interviews, Cantrell said Petitioner "did what he could to work with me; he would always be really concentrating on trying to answer questions when I'd go see him." *Id.* at 76. He described Petitioner as "very polite" and "very courteous" unlike many defendants Cantrell had represented who were "very obstructive" and "very rude." *Id*. at 74.

Mr. Cantrell testified that he inquired of both Petitioner and his family members whether Petitioner was addicted to drugs or alcohol. He testified that both Petitioner and his family told Cantrell that Petitioner was a "bad boozer," *id*. at 69, and that he smoked marijuana, *id*. at 70 & 71, but that he avoided hard drugs. *Id*. at 70. *See id.* at 71. Indeed,

according to Cantrell, Petitioner's brother was very vehement that Petitioner didn't do any hard drugs. *Id*. at 70. Cantrell thought that Petitioner told him he had tried coke a couple of times, *id*. at 71, but that Petitioner never told him that he did crank or methamphetamine nonstop the week before the murder or ever. *Id*. at 72. Nor did Petitioner tell Cantrell that he didn't sleep for three months before the murder because of his extensive drug or alcohol abuse, to Cantrell's recollection. *Id*. at 73. Cantrell never observed Petitioner to be suffering from delirium tremens or other signs of drug or alcohol withdrawal during the course of his representation, *id*. at 75-76, nor did he observe any needle marks on Petitioner.

Mr. Cantrell testified that the person who knew the most about Petitioner's childhood was his sister because she had raised Petitioner from the time he was in second, third or fourth grade. *Id*. at 61-62. She related that both of Petitioner's parents were alcoholics; that Petitioner was constantly sent back and forth between his parents; that the father was such a no-good he was not a fit person to live with; and that things were so bad that Petitioner went to live with his oldest sister when she married at age 15 or 16 and established her own household. *Id*. at 62. Cantrell testified that he inquired about whether Petitioner's parents "whipped up on" him a lot and was told that the mother would hit Petitioner with the fly swatter and yardsticks because Petitioner was "real impulsive and . . . was always getting in trouble and getting in fights." *Id*. Cantrell never talked to Petitioner's father and both Petitioner's mother and sister told Cantrell they didn't know what the father did or didn't do. *Id*. at 62-63. Both Petitioner's mother and sister said that Petitioner was always fighting with other kids, including his brothers and sisters, and getting in fights at school, which was a big

27

problem and one of the reasons Petitioner would go back and forth between parents.  *Id*. at

63-64 Petitioner told Cantrell his dad whipped him with a belt, *id*. at 65, but according to

Cantrell, Petitioner never discussed his stepfather with Cantrell.  Mr. Cantrell testified that

he wanted to put in evidence at the penalty stage of trial "the extraordinarily disruptive nature

of [Petitioner's] rearing, *id*. at 68, but he did not want the jury to hear that Petitioner had

spent his life getting in fights," *id*. at 69, so he had to be very careful in eliciting testimony

about Petitioner's childhood from Petitioner's mother not to open up the possibility of the

State discovering through cross-examination that Petitioner had exhibited a tremendous

violent tendency as a child by getting into fights with his brothers and sisters and other kids

at school.  *Id*. at 108-115.

Mr. Cantrell represented Petitioner in defense of the shooting of Joseph Greenwald

in Yukon, one of the felony convictions introduced at the sentencing stage to prove the

aggravating circumstances alleged.  *Id*. at 90-91.  According to Cantrell, the shooting

amounted to a case of self-defense.  *Id*. at 91 & 92.  Petitioner never told Cantrell a voice

named Larry was involved in the incident, *id*. at 91, and no hallucinations, diminished

capacity or mental defect was at play in that event.  *Id*. at 91-92.  Mr. Cantrell did not

represent Petitioner in the case of the assault and battery with a shotgun committed against

John Anglin, but Mr. Smith never related that the voice of Larry or other hallucination was

involved in that case, *id*. at 93-94 and, to the best of Cantrell's recollection, the Petitioner

told him he had no intention of hurting the man but deliberately shot the back window of his

car out.  *Id*. at 93.

Petitioner has adduced no evidence that Petitioner and/or Petitioner's family members provided Mr. Cantrell with more or different information than that to which Mr. Cantrell testified. Nor has Petitioner shown that records of his psychiatric care or treatment other than those which Mr. Cantrell procured were available and could have been obtained by him. Cantrell's unrebutted testimony establishes that he did not render deficient performance under *Strickland*. It is undisputed that Cantrell attempted to develop the very mitigation evidence which Petitioner now claims he could have and should have discovered and presented at trial. However, as Cantrell himself observed, most of the information was simply not available to him based upon what Petitioner and his family did and did not tell him. Cantrell's investigation of Petitioner's mental health issues was reasonable based upon the information he was provided and which came to his attention and the state of the law in 1987, when Petitioner was tried. He sought to procure records of Petitioner's prior psychiatric care and treatment but the only records which could be located, based upon the information he was furnished, were admitting and discharge records from one facility which the trial court refused to admit into evidence. Petitioner does not assert that those records revealed a diagnosis, provided material mitigation evidence or that trial counsel's failure to call a witness to authenticate those records was ineffective assistance.[1] Although Petitioner

---

[1] Indeed, if the records from Sacramento Medical Center which trial counsel obtained and which the trial court refused to admit are those from the Sacramento Medical Center Emergency Room dated October 10, 1978 included in Volume Two, Exhibit "12" of the Appendix Petitioner filed with his application for post-conviction relief, the records would not have been helpful to Petitioner and may have been harmful. They reveal that Petitioner was brought to the Sacramento Medical Center by police because Petitioner, who had been drinking rum, had been fighting with his sisters and threated to kill them. Admitting notes state that the patient "appears oriented in time x 3, no gross thought disorder, denies any homicidal or suicidal ideation,

does not specifically allege that trial counsel was ineffective in failing to request funds for or the appointment of a psychiatric expert to assist him in developing and presenting mitigating evidence, that argument is implicit in Petitioner's claim that if trial counsel had conducted a reasonable investigation, he could have presented evidence that, for example, Petitioner suffered from schizophrenia and brain damage – the kind of evidence embodied in the reports of Drs. Fleming and Lipman.  Moreover, Mr. Cantrell's only practical avenue of access to such psychiatric opinion evidence, given Petitioner's indigency, was to request funds for the hiring of such an expert or appointment of such an expert by the trial court. Given the facts that Petitioner had testified at the post-examination competency hearing, in trial counsel's presence, that he had received psychiatric treatment because he saw things and people that others said were imaginary and that he still saw imaginary people, suggesting visual hallucinations; that Mr. Cantrell knew that Petitioner was receiving psychotropic or "mind-altering" drugs in jail, had made a suicide attempt and had difficulty relating events in a sequential fashion; and that the State had alleged the "continuing threat aggravator," by today's standard's Mr. Cantrell's failure to request funds for or the appointment of a psychiatrist to assist him at the penalty phase of trial was not objectively reasonable. However, as the Tenth Circuit said in *Revilla v. Gibson*, 283 F.3d 1203, 1220 (10th Cir.), *cert. denied*, 537 U.S. 1021, 123 S.Ct. 541, 154 L.Ed.2d 430 (2002), "[t]he state of the law in 1987 clearly undercuts the ineffective assistance claim."  The Supreme Court in *Ake v. Oklahoma*,

---

denies any auditory or visual hallucinations, no paranoid ideation, speech clear, affect tearful at times, mood angry, proverbs-concrete-average intel."

470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) held that an indigent capital defendant must, upon request, be provided a psychiatric expert for the penalty phase "when the State presents psychiatric evidence of the defendant's future dangerousness." 470 U.S. at 83, 105 S.Ct. 1087, 84 L.Ed.2d at 66. The Tenth Circuit later extended *Ake* to require that an indigent capital defendant be provided, upon request, access to a competent psychiatrist if the State puts on *any* evidence, psychiatric or otherwise, of a defendant's dangerousness, so long as the defendant's mental condition would likely be a significant mitigating factor. *Revilla v. Gibson*, 283 F.3d at 1221, *citing Liles v. Saffle*, 945 F.2d 333, 341 (10th Cir. 1991) and *Rogers v. Gibson*, 173 F.3d 1278, 1285 (10th Cir. 1999). Oklahoma courts extended *Ake* in this manner in 1998, in *Fitzgerald v. State*, 972 P.2d 1157, 1169 (Okla. Crim. App. 1998). *See Revilla v. Gibson*, 283 F.3d at 1221. But because the State in Petitioner's case did not put on psychiatric evidence of Petitioner's future dangerousness and never indicated that it would do so, *Ake* did not require the appointment of an expert absent such evidence, and the Tenth Circuit's and OCCA's extensions of *Ake* did not take place until several years later, the Court cannot say that Mr. Cantrell's failure to request a psychiatrist expert to assist him in developing and presenting mitigating evidence at the penalty phase was professionally unreasonable in 1987. *See Revilla v. Gibson*, 283 F.3d at 1221 ("[W]e cannot say counsel's failure to request an expert was professionally unreasonable in 1987, at a time when *Ake* itself did not establish the validity of such a request, state case law rejected it, and even this circuit's extension of *Ake* would not take place for several years.").

Mr. Cantrell inquired of both Petitioner and of his family members concerning petitioner's use of drugs and alcohol.  Although they admitted Petitioner's heavy use of alcohol and long-time marijuana use, they denied essentially all other drug use, \notwithstanding Petitioner's later reports to Drs. Fleming and Lipman of extraordinarily heavy use of various drugs from a very young age and addiction to methamphetamine. Petitioner's trial counsel did conduct inquiries of Petitioner and Petitioner's family members concerning Petitioner's childhood only to learn perhaps a fraction of the information Petitioner years later apparently revealed to Drs. Fleming and Lipman.  Mr. Cantrell's decision not to present evidence that was disclosed to him of Petitioner being shuttled back and forth between his biological parents is presumed to have been made for tactical reasons and in the exercise of reasonable professional judgment.  Indeed, Mr. Cantrell testified that while he wanted the jury to hear about the disruptive nature of Petitioner's childhood, he did not want to risk the State learning and eliciting on cross-examination one of the reasons Petitioner was shuttled back and forth between parents – that he was always getting into fights with siblings or other children, evidence which would have shown Petitioner's propensity for violence.  Petitioner has failed to present evidence overcoming the strong presumption, as well as evidence suggesting, that counsel's decision not to present evidence concerning Petitioner's turbulent childhood was a strategic one made in the exercise of reasonable professional judgment.  *See generally Salladhin v. Mullin*, 380 F.3d at 1247-50.

In summary, the Court concludes that Petitioner's trial counsel's investigation of mitigating evidence was objectively reasonable.  Trial counsel's failure to present evidence

of Petitioner's turbulent childhood was based upon a strategic decision not to present such evidence due to the risk that Petition's childhood history of violence would be revealed on cross-examination, which would support the continuing threat aggravator alleged. Petitioner has failed to overcome the presumption with respect to the failure to present that evidence that, under the circumstances, the failure to present it was a matter of sound trial strategy and the exercise of reasonable professional judgment. With respect to Petitioner's trial counsel's failure to present other evidence of Petitioner's mental condition, evidence of Petitioner's brain damage and alcohol and drug use and/or addiction, the Court concludes that trial counsel's failure to present such evidence was not a result of trial counsel's deficient investigation into these subject areas for potential mitigation evidence but of Petitioner's and Petitioner's family's failure to disclose the information to trial counsel which could have been utilized by him as a mitigation evidence. This is a classic case where the reasonableness of counsel's actions or inactions was determined by the Petitioner's and Petitioner's family's actions or inactions. Notwithstanding the dearth of mitigation evidence presented by Petitioner's trial counsel in this case, trial counsel's performance was objectively reasonable because of the paucity of information Petitioner and his family disclosed to trial counsel, in spite of his repeated and proper inquiries. The Court finds it unnecessary to reach the prejudice prong of the *Strickland* inquiry.

## II.

Petitioner asserts that his appellate counsel's failure to assert that trial counsel's assistance at the second stage of trial was constitutionally ineffective was itself

constitutionally ineffective assistance. He makes that assertion for the purpose of showing cause excusing his procedural default of the claim for ineffective assistance of trial counsel. Because the Court has concluded that Petitioner's claim for ineffective assistance of trial counsel is not procedurally barred, it is unnecessary to reach Petitioner's claim of ineffective assistance of appellate counsel. Alternatively, even if Petitioner's claim of ineffective assistance of trial counsel were procedurally barred, because the omitted claim is without merit, *see* I, *supra*, appellate counsel's omission of the claim was not deficient performance. *See Miller v. Mullin*, 354 F.3d 1288, 12989 (10th Cir. 2004), *cert. denied*, _ U.S. _, 125 S.Ct. 1294, ___ L.Ed.2d ___ (2005); *Upchurch v. Bruce*, 333 F.3d 1158, 1163 (10th Cir.), *cert. denied*, 540 U.S. 1050, 124 S.Ct. 839, 157 L.Ed.2d 700 (2003); *Cargle v. Mullin*, 317 F.3d at 1202. Accordingly, Petitioner is not entitled to relief on this claim.

## III.

Petitioner asserts that he was denied a fair trial because he was not provided a psychiatric expert to give needed testimony at the competency hearing and at both the guilt and sentencing stages of trial. He contends that he was improperly denied appointment of an independent psychiatric expert pursuant to *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Respondent asserts in response that Petitioner's substantive *Ake* claims are procedurally barred from federal habeas review because they were first raised in Petitioner's post-conviction application and the OCCA found that the claims were waived pursuant to Okla. Stat. tit. 22, § 1086 inasmuch as they could have been raised on direct review. Acknowledging that *Ake* claims are subject to review if Petitioner demonstrates

34

cause and prejudice or the fundamental miscarriage of justice exception to procedural bar, and that ineffective assistance of appellate counsel would constitute cause sufficient to excuse Petitioner's default, Respondent addresses Petitioner's *Ake* claims in the context of an ineffective assistance of appellate counsel claim.

With respect to Petitioner's claim relating to expert assistance for the competency hearing, Respondent points out that Petitioner never made a request for funds to employ a mental health expert to assist the defense at the competency hearing; rather, Petitioner's trial counsel at the post-examination competency hearing requested the appointment of another mental health expert to conduct a competency examination.   Transcript of Hearing Held on December 31, 1986 at p. 14.   Respondent asserts that this is not an *Ake* claim because Petitioner's trial counsel's request was not one for funds for a defense expert and nothing in the Supreme Court's holding in *Ake* suggests it applies to competency proceedings where, as here, the Petitioner already had access to an independent examiner.   In any event, however, appellate counsel's failure to raise this claim cannot amount to constitutionally ineffective assistance because, Respondent asserts, it was not a "dead-bang winner," an issue that would have resulted in reversal on appeal, as demonstrated by *Ake v. State*, 778 P.2d 460, 464-65 (Okla. Crim. App. 1989).   To the extent Petitioner is asserting a procedural competency claim, Respondent asserts that a review of the record reveals that Dr. Quinn's evaluation, standing alone, was adequate to determine Petitioner's competency and that Petitioner points to no evidence at the time of trial which raises a doubt as to Petitioner's competency, *citing Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir.

2000), *cert. denied*, 531 U.S. 1161, 121 S.Ct. 1117, 148 L.Ed.2d 985 (2001) (habeas petition's challenge to adequacy of competency evaluation is of no consequence where no evidence at the time of trial raised a bona fide doubt as to competency).

Respondent maintains that Petitioner's claim relating to guilt phase expert assistance should be deemed abandoned because Petitioner did not develop that claim in his petition. As to Petitioner's claim relating to sentencing phase expert assistance, Respondent asserts that a review of the record reveals that appellate counsel was not constitutionally ineffective for failing to raise a substantive *Ake* claim based upon the trial court's failure to appoint a psychiatric expert for use during sentencing proceedings. The record, Respondent points out, contains no oral or written request by Petitioner or trial counsel for a state-funded psychiatric expert to assist Petitioner at any stage of trial. The only request for a psychiatric expert made by Petitioner was at the post-examination competency hearing. Secondly, Respondent asserts, no showing was made that Petitioner's sanity was a significant factor in his defense. Thirdly, Respondent asserts, Petitioner has failed to direct the Court to any authority that would require a trial court to *sua sponte* appoint a psychiatric expert where no request and no showing for such assistance has been made.

The Court agrees with Respondent that Petitioner's substantive *Ake* claims are procedurally barred from habeas review because the OCCA on post-conviction deemed the claims waived on an independent and adequate state law ground, Okla. Stat. tit. 22, § 1086, because they were not raised on direct appeal. *See Clayton v. Gibson*, 199 F.3d at 1175; *Sellers v. State*, 973 P.2d 894, 895 n. 9 (Okla. Crim. App. 1999); *Wallace v. State*, 935 P.2d

366 (Okla. Crim. App.), *cert. denied*, 521 U.S. 1108, 117 S.Ct. 2489, 138 L.Ed.2d 996 (1997); *Sellers v. State*, 889 P.2d 895, 897 (Okla. Crim. App.), *cert. denied*, 516 U.S. 880, 116 S.Ct. 214, 133 L.Ed.2d 146 (1995).   *Cf. Brecheen v. Reynolds*, 41 F.3d 1343, 1354 (10th Cir. 1994), *cert. denied*, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995).   However, because Petitioner has asserted ineffective assistance of appellate counsel in failing to raise his *Ake* claim or claims on appeal as cause for his procedural default, which assertion was also made to and rejected by the OCCA on post-conviction, the Court examines the merits of the underlying claims.

The Tenth Circuit has extended application of *Ake* to pretrial competency proceedings. *See Allen v. Mullin*, 368 F.3d 1220, 1235 (10th Cir. 2004), *cert. denied*, __ U.S. __, 125 S.Ct. 1301, __ L.Ed.2d __ (2005); *Walker v. Attorney General for the State of Oklahoma*, 167 F.3d 1339, 1348-49 (10th Cir.), *cert. denied*, 528 U.S. 987, 120 S.Ct. 449, 145 L.Ed.2d 366 (1999). At the post-examination competency hearing, Petitioner's trial counsel requested that the hearing be continued and that the court appoint a private physician to examine Petitioner for his competency.   Transcript of Hearing Held on December 31, 1986 at p. 14; *see id.* at pp. 23-24.   Trial counsel indicated that the request was made in light of Dr. Quinn's testimony that neither the Rorschach nor MMPI or any other tests were given to Petitioner by Dr. Quinn, *see* Dec. 31, 1986 Tr. at p. 14, the brevity of Dr. Quinn's examination, trial counsel's belief that Dr. Quinn, who was appointed by the court to examine Petitioner and evaluate and report on his competency and who testified at the post-examination competency hearing, had not conducted a sufficiently thorough examination, and because Dr. Quinnn did not ask the

Petitioner about prior medical problems and if so, when they occurred, who treated him and how. *See id*. at p. 24. The trial court denied the request "for the appointment of an independent psychologist or psychiatrist for purposes of the competency question" *id*. at 27, "based upon the definiteness of the doctor that was appointed pursuant to the statutes, and after a complete evaluation and reviewing of Defendant's testimony himself . . . ." *Id*.

"[A]ccess to a competent psychiatrist who will conduct an appropriate examination," as required by *Ake* does not mean that an "indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53, 66 (1985). Petitioner has not shown that he was without access to a competent and impartial psychologist or psychiatrist. Indeed, the record reveals that a competent and impartial psychologist was appointed to conduct an appropriate examination and competency evaluation. Dr. John Quinn, who was appointed to conduct an examination of Petitioner and report on his competence to stand trial, is a licensed psychologist with a Ph.D. in psychology who had eight years of training in psychology, had done competency evaluations "for many years," and served as executive director of the Chisholm Trail Mental Health Center at the time, where he did psychological evaluations, therapy, supervision and teaching. *See* Dec. 31, 1986 Tr. at p. 8. Although Petitioner's trial counsel questioned the appropriateness of the examination done by Dr. Quinn because it did not include psychological testing, the state-appointed psychologist himself testified that research has shown and he was of the opinion that administering a battery of psychological tests is not helpful to determining a person's competence to stand

38

trial and would not alter the competency determination.  Dec. 31, 1986 Tr. at pp. 9-10.

Under these circumstances, appellate counsel's omission of this issue on appeal was

objectively reasonable and not deficient performance.  Moreover, there is no reasonable

probability that but for appellate counsel's failure to raise this claim, Petitioner would have

prevailed on appeal.  *See Neill v. Gibson*, 278 F.3d 1044, 1057 & n. 5 (10th Cir. 2001)

(disavowing the "dead-bang winner" language or test), *cert. denied*, 537 U.S. 835, 123 S.Ct.

145, 154 L.Ed.2d 54 (2002).  At the time of Petitioner's direct appeal, neither the Tenth

Circuit nor the Oklahoma Court of Criminal Appeals had extended *Ake* to competency

hearings.  *See Walker v. Attorney General for the State of Oklahoma*, 167 F.3d 1339, 1348

(10th Cir. 1999) (applying *Ake* in competency context), *cert. denied*, 528 U.S. 987, 120 S.Ct.

449, 145 L.Ed.2d 366 (1999); *Ake v. State of Oklahoma*, 778 P.2d 460, 465 (Okla. Crim.

App. 1989) ("this Court has yet to determine whether the rationale of *Ake* extends to the

provision of a psychiatrist for the purposes of a competency hearing").  Moreover, the

Oklahoma Court of Criminal Appeals in *Ake* rejected the defendant's argument that his due

process rights were violated by the trial court's refusal to appoint a psychiatrist to aid him

in the post-examination competency hearing where the defendant, like Petitioner herein, had

access to competent and impartial experts who conducted competency examinations.  778

P.2d at 465.

Petitioner's trial counsel never requested funds for an expert psychologist or

psychiatrist to assist him at either stage of trial, as required to obtain an *Ake*-mandated

psychiatric expert.  *See Ake v. Oklahoma*, 470 U.S. at 83, 105 S.Ct. 1087, 84 L.Ed.2d at 66.

Petitioner did not raise the insanity defense and there is no evidence or indication in the trial record that Petitioner's sanity or mental condition at the time of the offense was likely to be a significant factor at trial. *See Ake v. Oklahoma*, 470 U.S. at 83, 105 S.Ct. 1087, 84 L.Ed.2d at 66. The evidence in the record does not show that Petitioner's mental condition was a significant mitigating factor, although the state did present evidence of Petitioner's dangerousness. *See Ake v. Oklahoma*, 470 U.S. at 83, 105 S.Ct. 1087, 84 L.Ed.2d at 66; *Revilla v. Gibson*, 283 F.3d at 1220-21. Petitioner points to no authority which would require the trial court to *sua sponte* appoint a psychiatric expert for a defendant where no request therefor was made and no showing therefor was made. Accordingly, because Petitioner's *Ake* claims are without merit, appellate counsel's failure to raise *Ake* claims relating to either the first or second stage of trial was not objectively unreasonable and was not, therefore, deficient performance. Moreover, for essentially the same reasons, there is no reasonable probability that had the claims been raised, Petitioner would have prevailed on appeal. With respect to a claim that Petitioner should have been provided an expert psychologist or psychiatrist for the penalty stage, not only was no request for same made by trial counsel, but at the time of Petitioner's appeal, neither the Tenth Circuit nor the Oklahoma courts had extended *Ake* to require that an indigent defendant, upon request, be provided a psychiatric expert for the penalty phase when the State did not, as in this case, present psychiatric evidence of the defendant's future dangerousness. *See Revilla v. Gibson*, 283 F.3d at 1221 (citing cases, including the earliest case in which *Ake* was so extended,

*Liles v. Saffles*, 945 F.2d 333, 341 (10th Cir. 1991), decided four days before the OCCA

decided Petitioner's direct appeal but long after Petitioner's briefs on appeal were filed).

In accordance with the foregoing, the OCCA's conclusion that Petitioner had not

demonstrated that appellate counsel's performance was outside the wide range of reasonable

professional assistance was not contrary to and did not involve an unreasonable application

of clearly established federal law as determined by the United States Supreme Court.  28

U.S.C. § 2254(d)(1).  The OCCA's conclusion was not opposite that reached by the Supreme

Court on a question of law, the OCCA did not decide the case differently than the Supreme

Court has decided a case with materially indistinguishable facts, and the OCCA did not

unreasonably apply the governing legal principles to the facts of Petitioner's case.  *See*

*Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389, 430 (2000).

## IV.

Petitioner next asserts that habeas relief is warranted because the State employed an

unconstitutional burden of proof at Petitioner's competency hearing, requiring Petitioner to

prove by clear and convincing evidence that he was not competent to stand trial.  Petitioner's

competency hearing predated the Supreme Court's 1996 decision in *Cooper v. Oklahoma*,

517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).  Petitioner first raised this claim in

post-conviction proceedings.  The Oklahoma Court of Criminal Appeals held that the issue

was waived because Petitioner had failed to raise it on direct appeal and *Cooper* did not

constitute a new rule of constitutional law or an intervening change in constitutional law.

However, Petitioner asserts that the Court can review this claim, relying on *Walker v.*

41

*Attorney General for the State of Oklahoma*, 167 F.3d 1339 (10th Cir.), *cert. denied*, 528 U.S. 987, 120 S.Ct. 449, 145 L.Ed.2d 366 (1999) to assert that the claim is not procedurally barred.  Finally, because fourteen years have elapsed since Petitioner's original competency hearing, a retrospective competency hearing would not be the appropriate remedy and would in fact violate due process, Petitioner maintains.  He contends that the Court must reverse the conviction and remand for a new competency hearing and for a new trial if Petitioner is found to be competent.

This claim is not procedurally barred.  In concluding that Petitioner's procedural competency claim had been waived, the Oklahoma Court of Criminal Appeals correctly applied the "pre-amended" post-conviction rules, *see* Okla. Stat. tit. 22, § 1089, because Petitioner's direct appeal and application for post-conviction relief were filed before the 1995 amendments took effect.  *Compare with Walker v. Attorney General for State of Oklahoma*, 167 F.3d at 1344-45.  However, the Oklahoma Court of Criminal Appeals, observing that Petitioner's *Cooper* claim would not be waived if *Cooper* constituted "an intervening change in constitutional law [which] impacts the judgment and sentence," *Smith v. State*, Opinion Affirming Denial of Post-Conviction Relief and Request for Evidentiary Hearing, No. PC 97-1656 (Okla. Crim. App. July 27, 1999) at p. 8 (quoting *Rojem v. State*, 829 P.2d 683, 684 (Okla. Crim. App.), *cert. denied*, 506 U.S. 958, 113 S.Ct. 420, 121 L.Ed.2d 343 (1992)), concluded that *Cooper* does not constitute "new law" because the holding was based upon well-established constitutional principles and precedents that existed prior to Petitioner's convictions and appeal.  *Id*. at pp. 8-9.  "Because *Cooper* did not constitute either a new law

42

or an intervening change in constitutional law, Smith could have constructed a claim relating to the standard of proof applied at his post-examination competency bench trial at the time of the bench trial and on direct appeal," the Oklahoma appellate court said. *Id*. at p. 9. Because Petitioner did not do so, his claim was waived, the Oklahoma Court of Criminal Appeals held. This stands in contrast to dicta in *Valdez v. State*, 933 P.2d 931, 933 n. 7 (Okla. Crim. App. 1997), which the Tenth Circuit in *Walker v. Attorney General for State of Oklahoma*, 167 P.2d at 1345, found controlling on this issue, and in contrast to prior Oklahoma precedent addressing what constituted an intervening change in the law within the meaning of Oklahoma's post-conviction statutes prior to their amendment in 1995. *See Stafford v. State*, 815 P.2d 685, 687 (Okla. Crim. App. 1991) (although the Supreme Court's decision in *Maynard v. Cartwright*, 486 U.S. 358, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) was based upon principles of law previously announced, *Cartwright* constituted an intervening change in the law because the precise issue was not definitively decided until *Cartwright*); *VanWoundenberg v. State*, 818 P.2d 913, 915 (Okla. Crim. App. 1991) (same), *cert. denied*, 503 U.S. 993, 112 S.Ct. 1693, 118 L.Ed.2d 405 (1992). Accordingly, the Court cannot say that Oklahoma's waiver rule in this context is an adequate state law ground because it is not consistently applied by Oklahoma courts in this context. *See id*. *See also Walker v. Attorney General for State of Oklahoma*, 167 F.3d at 1345.

To prevail on his procedural competency claim, Petitioner must establish that a reasonable judge should have had a bona fide doubt as to Petitioner's competence at the time of trial, that is, that a reasonable judge should have doubted his ability to consult with a

lawyer with a reasonable degree of rational understanding and/or whether he had a rational and factual understanding of the proceedings against him. *McGregor v. Gibson*, 248 F.3d 946, 954 (10th Cir. 2001) (quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, 825 (1960)).

Viewed objectively, however, the entire record evidence does not raise a bona fide doubt as to Petitioner's competency to stand trial. *See Smith v. Mullin*, 379 F.2d at 930-31; *McGregor v. Gibson*, 248 F.3d at 954-55. Any doubt raised by Petitioner's suicide attempt or his counsel's statements was dispelled by the report and testimony of Dr. Quinn, an independent psychologist, who testified at the competency hearing. Petitioner's testimony at the post-examination competency hearing that he saw people who others said were imaginary and that he had received psychiatric treatment in California some years prior are insufficient to raise a bona fide doubt as to Petitioner's competency to stand trial. There is no evidence that Petitioner's seeing imaginary persons, if credited as true (although controverted by the testimony of the psychologist appointed to examine Petitioner, who said there was no evidence of hallucinations, Dec. 31, 1986 Tr. at p. 12), interfered with Petitioner's ability to rationally and factually understand the proceedings against him or to consult with his lawyer with a reasonable degree of rational understanding. The Tenth Circuit has rejected the notion that a history of mental illness and substance abuse – including a prior suicide attempt and inpatient treatment – are alone sufficient to establish a bona fide doubt as to competency to stand trial. *See Walker v. Gibson*, 228 F.3d at 1227. Indeed, it is apparent from the record of the post-examination competency bench trial that had the trial

44

court applied the *Cooper* standard, requiring that Petitioner demonstrate his incompetency by a preponderance of the evidence (and the Court only *presumes* that the trial court did *not* apply that standard, *see Walker v. Gibson*, 228 F.3d at 1226), there is no question but that the trial court would have found that Petitioner had failed to carry that burden and that Petitioner was not incompetent to stand trial. *Compare with Smith v. Mullin*, 379 F.3d at 930 (even though trial court applied the incorrect standard at the pretrial competency hearing, the petitioner had failed to prove his incompetence even by a preponderance of the evidence). After the post-examination competency hearing and during trial, neither defense counsel nor the trial judge expressed any concerns about Petitioner's competency to stand trial. Viewing the entire trial record and the totality of the circumstances objectively, the Court cannot say that the trial judge should have had a bona fide doubt concerning Petitioner's competence. Petitioner is not entitled to relief on this claim.

## V.

As his fifth ground for relief, Petitioner asserts that the Oklahoma Court of Criminal Appeals was biased as evidenced by a question Judge Johnson asked Petitioner's counsel during oral argument on appeal. The question was predicated upon inaccurate information about a stabbing at the penitentiary, in which Petitioner was not involved. Petitioner's appellate counsel corrected Judge Johnson's misinformation. Nevertheless, Petitioner filed a petition for rehearing with the Oklahoma Court of Criminal Appeals on the ground that Judge Johnson should have recused himself. He subsequently, on January 25, 1999, filed a motion requesting Judge Johnson recuse himself from participation in the review and

decision of Petitioner's post-conviction application.  Both a rehearing of the direct appeal and Petitioner's motion for recusal were denied.  Petitioner contends that he has, therefore, exhausted his claim predicated upon a biased tribunal on appeal, citing *Bear v. Boone*, 173 F.3d 782 (10th Cir. 1999).

Petitioner presented no federal constitutional claim or argument that a constitutional violation resulted from Judge Johnson's question before the state appellate court.  Thus, any federal constitutional claim predicated upon Judge Johnson's or the entire Court of Criminal Appeals' bias has not been exhausted.  But exhaustion can be excused because if Petitioner sought to assert such a federal constitutional claim in another application for post-conviction relief, the OCCA would deem the claim waived on an adequate and independent state law ground, specifically Okla. Stat. tit. 22, § 1086.  *See Thomas v. Gibson*, 218 F.3d 1213, 1221 (10th Cir. 2000).  Petitioner makes no attempt to show cause and prejudice for his failure to assert this claim as a constitutional claim or that a fundamental miscarriage of justice will result if the Court does not review this claim.  Therefore, this claim is procedurally barred.

Even if the claim were not barred, the Court would find it meritless.  Petitioner has pointed to no evidence of actual bias or prejudice of Judge Johnson or of the OCCA against Petitioner and the Court finds none.  *Compare with Fero v. Kerby*, 39 F.3d 1462, 1479 (10th Cir. 1994), *cert. denied*, 515 U.S. 1122, 115 S.Ct. 2278, 132 L.Ed.2d 282 (1995) *and with Nichols v. Sullivan*, 867 F.2d 1250, 1254 (10th Cir.), *cert. denied*, 490 U.S. 1112, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989) (quoting *Dyas v. Lockhart*, 705 F.2d 993, 996 (8th Cir.), *cert. denied*, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983)).  The likelihood of bias or

appearance thereof can in some circumstances be so substantial as to create a conclusive presumption of actual bias, *Fero v. Kerby*, 39 F.3d at 1478, quoting *Nichols*, 867 F.2d at 1254, but in this case there is no appearance of judicial bias sufficient to override the presumption of honesty and integrity, much less a likelihood or appearance of bias so substantial as to create a conclusive presumption of actual bias. *See Fero v. Kirby*, 39 F.3d at 1478. No circumstances presenting an incentive for Judge Johnson or the OCCA to find one way or the other or a real possibility of bias are shown. *See id*. at 1478-80. The excerpt of the transcript of Oral Argument attached to Petitioner's Motion Requesting Judge Johnson to Recuse Himself filed in the OCCA as well as the Affidavit of Terry J. Hull attached to the Petition for Rehearing show that Judge Johnson received the misinformation about Petitioner from a law clerk in the court and that Judge Johnson's misinformation and any effect thereof on the OCCA as a court were corrected by Petitioner's counsel. Petitioner's due process right to an impartial tribunal on appeal was not violated. *See id* at 1480.

## VI.

In his next ground for relief, Petitioner asserts both that the evidence was insufficient to support his conviction and that the trial court erred by not giving the accomplice corroboration instruction. The latter claim is exhausted, having been raised on direct appeal. However, Petitioner's claim of insufficient evidence, not predicated upon nor coupled with the failure to give an accomplice corroboration instruction and insufficient evidence to corroborate the testimony of Pam Rutledge and Rita Cagle, is unexhausted and would be deemed waived by the OCCA pursuant to Okla. Stat. tit. 22, § 1086. Accordingly, this claim

is procedurally barred from habeas review unless Petitioner demonstrates cause and prejudice or that a fundamental miscarriage of justice would result from the failure to review it. Petitioner has not attempted to do either. Thus, Petitioner's insufficient evidence claim under *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781 2787, 61 L.Ed.2d 560, 571-72 & 573 (1979) is procedurally barred. Even assuming, however, that this were not so, no due process violation occurred. Viewing the evidence in the light most favorable to the prosecution, the Court cannot say that no rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt. *Compare with Jackson v. Virginia*, 443 U.S. at 316-17 & 319, 99 S.Ct. at ___, 61 L.Ed.2d at 572 & 573.

"The Constitution does not prohibit convictions based primarily on accomplice testimony." *Foster v. Ward*, 182 F.3d 1177, 1193 (10th Cir. 1999), *cert. denied*, 529 U.S. 1027, 120 S.Ct. 1438, 146 L.Ed.2d 326 (2000) (quoting *Scrivner v. Tansy*, 68 F.3d 1234, 1239 (10th Cir. 1995), *cert. denied*, 516 U.S. 1178, 116 S.Ct. 1277, 134 L.Ed.2d 223 (1996)). There is not and never has been any constitutional requirement that an accomplice's testimony be corroborated. *Id.* The failure to instruct the jury that Rutledge and Cage were accomplices to the felony murder and that their testimony must be corroborated, like any alleged instructional error, is only grounds for habeas relief if in the context of the entire trial, the failure to give the instruction rendered the trial fundamentally unfair. *See Foster v. Ward*, 182 F.3d at 1193, *citing Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir.), *cert. denied*, 514 U.S. 1115, 115 S.Ct. 1972, 131 L.Ed.2d 861 (1995). The testimony of Rutledge and Cagle was credible and consistent, with each corroborating the other, and more than adequate to

establish guilt beyond a reasonable doubt. Petitioner's counsel had adequate opportunity to attack their credibility and availed himself of that opportunity. The trial court instructed the jury that it was their responsibility to determine the credibility of each witness and to weigh the testimony considering any bias, interest or prejudice a witness might have and the relation of the witness to the parties. Tr. XI 29-30. Moreover, the record reveals that neither Rutledge or Cagle was an accomplice as a matter of law. Therefore, Petitioner was not even entitled to an accomplice instruction as a matter of state law. *See Howard v. State*, 561 P.2d 125, 130 (Okla. Crim. App. 1977) ("If a witness is clearly shown to be an accomplice as a matter of law, the trial court must instruct the jury that the witness is an accomplice and that his testimony must be corroborated . . . It is only where the facts of the case are reasonably susceptible to alternate findings that the witness is or is not an accomplice that the issue becomes one of fact requiring submission to the jury without appropriate instructions."). Finally, there was, in any event, adequate independent corroboration of Rutledge's and Cagle's testimony. *See Smith v. State*, 819 P.2d at 275 (Petitioner was arrested on day of murder driving car on which blood consistent with victim was found and in which ammunition of the same type used to kill victim was found and there was no evidence anyone else had had dominion and control over the car). Thus, the OCCA's adjudication of Petitioner's claim relating to the trial court's failure to give an accomplice corroboration instruction was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). The OCCA's conclusion was not opposite to that reached by the United States

Supreme Court on a question of law; it did not decide the case differently than the Supreme

Court has decided a case with materially indistinguishable facts; and it did not unreasonably

apply the governing legal principles to the facts of the Petitioner's case.  *See Williams v.*

*Taylor*, 529 U.S. at 413, 120 S.Ct. at 1523, 146 L.Ed.2d at 430.  Petitioner is not entitled to

relief on this ground or grounds.

## VII.

Petitioner next asserts that he was denied a fair trial because the trial judge did not

give a specific instruction on assessing the credibility of an informant.  Petitioner argues that

the failure to so instruct the jury denied him his right to due process and his Sixth

Amendment right to confront the witnesses against him.

A claim that Petitioner's due process rights were violated by the failure to give a

cautionary instruction on the credibility of an informant was raised by Petitioner in a

supplemental brief on direct appeal and was addressed on the merits by the OCCA.  Hence,

that claim is exhausted.  However, Petitioner never asserted on appeal or in post-conviction

proceedings that a violation of his Sixth Amendment confrontation rights resulted from the

failure to give an instruction on an informant's credibility.  Hence, that claim is not exhausted

but the OCCA would now find the claim waived or procedurally barred.  Therefore,

exhaustion would be fruitless.  The failure to raise a claim on initial post-conviction review

is an independent and adequate state law ground; therefore, Petitioner's Sixth Amendment

claim is procedurally barred, *see Thomas v. Gibson*, 218 F.3d at 1221-22, unless Petitioner

demonstrates cause and prejudice or that a fundamental miscarriage of justice will occur if

50

this claim is not reviewed.  Petitioner has not shown or even attempted to show either.  Thus, the Sixth Amendment claim is procedurally barred and the Court does not address it.

The OCCA rejected Petitioner's claim concerning the failure to give this instruction on state law grounds, finding that Pam Rutledge was not an informant when she acquired or gave information concerning *this* case and that she had no stake in the outcome of this case as a result of her prior informant work.  *Smith v. State*, 819 P.2d 276.  These findings are presumed correct pursuant to 28 U.S.C. § 2254(e)(1) and Petitioner has pointed to no evidence, much less clear and convincing evidence, rebutting this presumption.  *Id.  A fortiori*, Petitioner's trial was not rendered fundamentally unfair as a result of the failure to give an informant instruction.  Finally, even if Rutledge had been an informant in relation to Petitioner's case, Petitioner has not shown that there is a recognized federal constitutional right to a cautionary jury instruction regarding an informant's testimony.  *See Smith v. Gibson*, 197 F.3d 454, 460 (10th Cir. 1999), *cert. denied*, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 60 (2000).

Petitioner's due process claim predicated on the failure to give a cautionary instruction regarding an informant's testimony is without merit.  The OCCA's adjudication of Petitioner's claim did not result in a decision that was contrary to or involved an unreasonable application of clearly established federal law based on Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  Nor was the OCCA's decision based on an unreasonable determination of the facts in light of the evidence presented to it.  28 U.S.C. § 2254(d)(2).

Petitioner's Sixth Amendment claim predicated on the same instructional failure is procedurally barred, not subject to habeas review.

## VIII.

Petitioner makes a claim under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) of a due process violation based upon the prosecutor's alleged failure to furnish all of the reports disclosing all statements of Pam Rutledge and Rita Cagle. Petitioner apparently believes that Pam Rutledge's original statement did not solely impeach Mr. Smith but shifted the responsibility for the felony murder to Rita Cagle as well as Petitioner. Citing *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547 (4th Cir. 1999) and *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), Petitioner contends that an evidentiary hearing on this claim is warranted.

The Court does not address this claim, however, because it is procedurally barred. Petitioner's *Brady* claim was raised for the first time in Petitioner's post-conviction relief application. The OCCA found that the claim was waived because the issue could have been but was not raised on direct appeal. *Smith v. State*, No. PC-97-1656, slip op. at 4 (Okla. Crim. App. 1999) (No. PC 97-1656). The OCCA's determination that the claim was waived is an independent and adequate state law ground for denying habeas relief. *See Ellis v. Hargett*, 302 F.3d 1182, 1186 (10th Cir. 2002), *cert. denied*, 537 U.S. 1236, 123 S.Ct. 1361, 155 L.Ed.2d 202 (2003); *Hain v. Gibson*, 287 F.3d 1224, 1230 (10th Cir. 2002), *cert. denied*, 537 U.S. 1173, 123 S.Ct. 993, 154 L.Ed.2d 916 (2003). Petitioner has not shown or attempted to show either cause and prejudice or that a fundamental miscarriage of justice will

52

occur if this claim is not reviewed.  Obviously, because this claim is procedurally barred, no evidentiary hearing on it is warranted.

## IX.

In his ninth ground for relief, Petitioner asserts that the "continuing threat" aggravating circumstance under Oklahoma law is unconstitutional.  He does not specify whether he maintains that that aggravator is unconstitutional on its face or as applied or both. Petitioner does recognize, however, that the Tenth Circuit has upheld the constitutionality of this aggravator on several occasions but states that he wishes to preserve the issue in case of Supreme Court intervention on the issue.

This claim is without merit.  The Tenth Circuit has repeatedly held that Oklahoma's continuing threat aggravator is constitutional, both facially and as applied.  *See Sallahdin v. Gibson*, 275 F.3d at 1232; *Medlock v. Ward*, 200 F.3d 1314, 1319 (10th Cir.), *cert. denied*, 531 U.S. 882, 121 S.Ct. 197,148 L.Ed.2d 137 (2000); *Hooks v. Ward*, 184 F.3d 1206, 1238 (10th Cir. 1999); *LaFevers v. Gibson*, 182 F.3d 705, 720 (10th Cir. 1999); *Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999), *cert. denied*, 529 U.S. 1167, 120 S.Ct. 1188, 145 L.Ed.2d 1093 (2000); *Castro v. Ward*, 138 F.3d 810, 816 (10th Cir.), *cert. denied*, 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998); *Nguyen v. Reynolds*, 131 F.3d 1340, 1352-54 (10th Cir. 1997), *cert. denied*, 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103 (1998).

## X.

Petitioner next asserts that his "punishment phase was tainted by confusing and unconstitutional weighing instructions."  He complains that Instructions Nos. 40 and 42, O.R.

244 & 246, reverse the statutory formula for weighing aggravating and mitigating circumstances, "allow[ing] the death penalty to be imposed whenever *any* aggravating circumstance outweighs *any* mitigating circumstance."

This claim is exhausted because Petitioner raised it on direct appeal. Upon the Court's review of the subject instructions in conjunction with all of the punishment-stage instructions, there is no reasonable likelihood that the jury applied the instructions in such a way that it was prevented from considering or giving effect to any mitigating evidence. *See Boyd v. Ward*, 179 F.3d at 924. *See also Smallwood v. Gibson*, 191 F.3d 1257, 1271 (10th Cir. 1999), *cert. denied*, 531 U.S. 833, 121 S.Ct. 88, 148 L.Ed.2d 49 (2000); *Duvall v. Reynolds*, 139 F.3d 768, 791 (10th Cir. 1998), *cert. denied*, 525 U.S. 933, 119 S.Ct. 345, 142 L.Ed.2d 284 (1998). This claim is without merit.

## XI.

In his final ground for relief, Petitioner asserts that the cumulative effect of all errors which occurred at the trial and appellate levels in state court warrant the granting of habeas relief. But cumulative error analysis only applies where there are two or more actual errors, *see Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998), *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999); *see also Smith v. Mullin*, 379 F.3d 919, 935 n. 8 (10th Cir. 2004), which Petitioner failed to show and the Court did not find in this case. Thus, Petitioner is not entitled to relief on this claim.

## CONCLUSION

In accordance with the foregoing, the petition of Richard Tandy Smith for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

**IT IS SO ORDERED this 17th day of May, 2005.**

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE